**MICHELLE L. COLDREN,**

       Plaintiff,

v.

**MICHAEL J. ASTRUE,**
Commissioner of Social
Security,

       Defendant.

**No. 10-CV-04080-DEO**

**Memorandum and Order**

_____

## I. Introduction and Background

This matter is before the Court pursuant to Michelle L. Coldren's (Plaintiff) request for disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq., and supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.

The Plaintiff has made two attempts to qualify for disability benefits. Tr. 30, 34. In May of 2006, she filed claiming a primary diagnosis of Bipolar Disorder, a secondary diagnosis of thyroid disorder, and complaints related to asthma and arthritis; and, in October of 2006, she filed claiming fractures of her L1 and C7 vertebrae, resulting from a car accident, and Major Depressive Disorder. Id. This Court is reviewing the ALJ's decision to her second claim.

<u>Id.</u>

The SSA initially denied her second claim on January 12, 2007, and, upon reconsideration, on May 7, 2007. <u>Id.</u> On October 7, 2008, a hearing was held before an Administrative Law Judge (ALJ). <u>Id.</u> On November 28, 2008, the ALJ denied Plaintiff disability benefits and supplemental security income benefits. Tr. 26-27. On May 14, 2010, the SSA Appeals Council denied Plaintiff's request for review. Tr. 6-8.

This Court has authority to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383 (c)(3).

## II. Facts

Plaintiff claims a disability onset date of October 7, 2006. Tr. 17. The Plaintiff "met the insured status requirements of the Act through March 31, 2007[1]." Tr. 19. Thus, the relevant time period for this Court's consideration for onset of disability is October 7, 2006, through March 31, 2007.

The Plaintiff has an 11th grade education with no past relevant work experience. Tr. 31. Her work history includes

---

[1] A plaintiff is required to have 20 quarters of coverage within the past 40-quarter period to be insured and, therefore, eligible for disability benefits. 42 U.S.C. § 416(i)(3)(B)(i); 20 C.F.R. § 404.130(b)(2).

"brief periods of employment" as a housekeeper at hotels "and work as a dishwasher at various cafes." Tr. 290. Most recently, she was a hostess at a steak house from November 2005 to March 2006. Id. She claims the customers frightened her and was fired because of her "decreasing ability to function." Id. For portions of 2006, she cleaned her ex-husband's house and business premises for 4 to 5 hours a week. Id.

She has a history of depression, Bipolar Disorder[2], and alcohol abuse. Tr. 31. As a child, she was a victim of sexual, emotional, and physical abuse. Tr. 281. Her biological father and step-father "frequently" forced her into sexual activities, and she was severely beaten beginning at age 5. Tr. 281. Her second husband continued the cycle of abuse. Tr. 289. "Four or five times his abuse resulted in the need for medical treatment." Id. On one occasion, "he broke all the bones in the upper part of her mouth and lower part of her nose." Id.

---

[2]"Bipolar Disorder involves periods of elevated or irritable mood (mania), alternating with periods of depression. The 'mood swings' between mania and depression can be very abrupt." *Bipolar disorder*, Pub Med Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001924/, last visited May 20, 2011.

The Plaintiff has taken a number of prescription medications for her ailments since 2006:  (1) Depakote for Bipolar Disorder, (2) Lisnoprel, Lotril and Enalapril for high blood pressure, (3) Synthroid and Levothroxine for Hashimoto's Disease[3], (4) Clonodine and Estraven for menopause, (5) Tremadal, Gabapentin, and Hydrocodone for her back pain, (6) Albuterol for asthma, (7) Amatriptolene and Zoloft for depression, and (8) Seroquel for sleep disturbances.  Tr. 115, 155, and 469.

In July of 2004, a diagnostic report from Seasons Center for Community Health indicates Plaintiff was having increased symptoms of life-long depression and appeared "tearful, shaking, and highly distressed."  Tr. 271 and 273.  Her symptoms included suicidal thoughts, alcohol/drug abuse, withdrawal, relationship concerns, and flashbacks.  Tr. 272.

---

[3] "In Hashimoto's disease, also known as chronic lymphocytic thyroiditis, your immune system attacks your thyroid gland.  The resulting inflamation leads to an underactive thyroid gland (hypothyroidism)." *Hashimoto's disease*, Mayo Clinic, http://www.mayoclinic.com/health/hashimotos-disease/DS00567, last visited May 20, 2011.

Hypothyroidism often results in a low metabolic rate, weight gain, and somnolence.  Stedman's Medical Dictionary 841 (26th ed. 2006).

On May 5, 2006, the Plaintiff filled out an adult function report related to her first disability claim[4]. Tr. 183-90. She indicated she did not sleep well, cried a lot, and stayed inside her home for fear of having to be around other people. Tr. 183. She claimed her family wanted nothing to do with her, and her only friend was her ex-husband. Tr. 188. The report concludes:

> I really just hide at home because I fear I may start drinking or doing something dumb, or meeting someone who may be mean to me or abuse me in any way. My life is better or safer at home.

Tr. 190.

As of May 4, 2006, the record indicates Plaintiff did not have any private health insurance. Tr. 110.

On May 11, 2006, Plaintiff's daughter, Mrs. Hicks, filled out a function report relating to her mother's mental condition. Tr. 191-98. In the report, she recognized Plaintiff was physically capable of a full range of activities from grocery shopping to mowing the lawn but had problems managing money and focusing on tasks because of her mental

---

[4] As previously noted, this Court is not reviewing the Commissioner's determination related to Plaintiff's first attempt to qualify for disability. Nevertheless, the function report is relevant in that it deals with Plaintiff's secondary diagnosis, depression/bipolar disorder, for the complaint currently before this Court.

illness. Tr. 191-95. Mrs. Hicks also noted Plaintiff had few close friends, was moody and argumentative, suffered from Agoraphobia[5] and paranoia, and was estranged from her family. Tr. 195-97. Mrs. Hicks felt her mother's mental condition affected her memory, concentration, and ability to complete tasks and get along with others. Tr. 196.

On May 31, 2006, Dr. Marandola completed a psychological assessment of Plaintiff. Tr. 288. A mental status exam revealed mild cognitive impairment. Tr. 291. Dr. Marandola also indicated Plaintiff was "not well-oriented to person, place and time," naming the wrong season, name of the facility she was being interviewed in, and day. Tr. 291-92. Dr. Marandola also indicated Plaintiff "had life long problems with attention and concentration . . . difficulty interacting with people," including "supervisors, co-workers and the public over extended periods of time," and difficulty "consistently utilizing good judgment and adjusting well to change." Tr. 292-93. Plaintiff scored in the severe range of

---

[5] "A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks." Stedman's Medical Dictionary 38 (26th ed. 2006).

depression. Tr. 292. Dr. Marandola assigned Plaintiff a Global Assessment of Functioning (GAF) score of 53.[6]

On June 19, 2006, Dr. Garfield completed a mental Residual Functional Capacity (RFC) assessment. Tr. 221-37. Dr. Garfield noted the Plaintiff had "a horrific childhood in which she [was] repeatedly subject to very serious child abuse." Tr. 223. He noted her past diagnoses as Post Traumatic Stress Syndrome (PTSD),[7] "as well as Panic Disorder with Agoraphobia, and Bipolar I Disorder."[8] Id. Dr. Garfield

---

[6] GAF "is for reporting the clinician's judgment of the individual's overall level of functioning." A score between 50 and 60 indicates "moderate difficulty in social occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 and 34 (4th ed., Text Revision 2000).

[7] "Post-traumatic stress disorder is a type of anxiety disorder. It can occur after you've seen or experienced a traumatic event that involved the threat of injury or death . . . People with PTSD re-experience the event again and again in at least one of several ways. They may have frightening dreams and memories of the event, feel as though they are going through the experience again (flashbacks), or become upset during anniversaries of the event." *Post-traumatic stress disorder*, Pub Med Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001923/, last visited May 20, 2011.

[8] Type 1 bipolar disorder is the most severe form of bipolar disorder. "People with bipolar disorder type 1 have had at least one fully manic episode with periods of major depression. In the past, bipolar disorder type 1 was called manic depression." *Bipolar disorder*, Pub Med Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001924/, last visited May 20, 2011.

assessed the Plaintiff with moderate restrictions of
activities of daily living, moderate difficulties in
maintaining social functioning, moderate difficulties in
maintaining concentration persistence, or pace, and one or two
episodes of decompensation.[9]  Tr. 235.  The record does not
indicate whether Dr. Garfield interviewed the Plaintiff. Tr.
221-37.  Dr. Garfield concluded:

> with her substance abuse now in early full
> remission, greater stability has been
> restored to her daily functioning, as
> witness to regaining the trust of her adult
> daughter that she can now be trusted to
> take care of a grandchild.  Moderate
> limitations can be expected in the area of
> interpersonal functioning, which is
> probably also the case with attention,
> concentration and pace.  So long as the
> claimant can adhere to her present pattern
> of abstinence, she can be expected to
> remain capable of engaging in routine
> unskilled competitive employment.

Id.

---

[9]  "Episodes of decompensation are exacerbations or
temporary increases in symptoms or signs accompanied by a loss
of adaptive functioning, as manifested by difficulties in
performing activities of daily living, maintaining social
relationships, or maintaining concentration persistence, or
pace . . . Episodes of decompensation may be inferred from
medical records showing significant alteration in medication;
or documentation of the need for a more structured
psychological support system."  20 C.F.R. Pt. 404, Subpt. P,
App. 1, 12.00(A)(4).

On July 17, 2006, Dr. Daly completed a case analysis of Plaintiff's physical claims. Tr. 239. There is no indication Dr. Daly examined the Plaintiff. In the report, Dr. Daly dwells on the Plaintiff's credibility, noting a lack of medical evidence and Mrs. Hick's reports that Plaintiff could mow the lawn and engage in other physical activities as evidence that Plaintiff's claimed arthritis lacked credibility. Dr. Daly further noted that "contributing to the erosion of credibility is the history of alcohol abuse" and "chronic use of marijuana." Tr. 239.

On October 7, 2006, the Plaintiff was in a car accident and ejected from the vehicle through the windshield. Tr. 247, 302, and 400. She landed approximately 28 rows into a cornfield along the side of the road, culminating in two fractures in her spine, a punctured lung, and damage to her Pancreas. Id. Records from Mercy Medical Center indicate Plaintiff's spine fractures were an "L1 compression fracture" with a 6.6 mm retropulsion[10] and 10% angulation of the spine and a "C7 nondisplaced cervical laminar[11] fracture." Tr. 310

---

[10] "A pushing back of any part." Stedman's Medical Dictionary 1541 (26th ed. 2006).

[11] A lamina is a "[t]hin plate or flat layer." Stedman's Medical Dictionary 932 (26th ed. 2006).

9

and 323. As of October 16, 2011, she was exhibiting "moderate pain across her lower back." Tr. 312. She was also moving "all extremities well." Tr. 313. She was given a neck collar and a Thoraco-Lumbo-Sacral-Orthosis[12] (TLSO) brace to limit her range of motion. Tr. 350.

On November 2, 2006, Plaintiff visited Dr. Schumaker for an examination 3 weeks after her accident. Plaintiff noted "mild improvement with her mid back pain." Tr. 352. She continued to wear her neck collar and TLSO brace. Id.

On November 7, 2006, one month after the accident, Plaintiff filled out a personal pain/fatigue questionnaire. Tr. 167-70. She indicated she could walk no more than a block, could not sit for a long period of time, could not think clearly due to pain, and could not tie her shoes. Id.

On November 23, 2006, Plaintiff filled out a function report. Tr. 159-166. She indicated she had difficulty bending over and difficulty brushing her hair. Tr. 161. Her back pain woke her every 2 hours at night. Id.

---

[12] "The most common form of a TLSO brace is called the 'Boston brace', and it may be referred to as an 'underarm' brace. This brace is . . . custom molded from plastic. It works by applying three-point pressure to the curvature to prevent its progression."
Types of Scoliosis Braces, *spine-health*, http://www.spine-health.com/conditions/scoliosis/types-scoliosis-braces, last visited May 23, 2011.

On November 28, 2006, Dr. Schumaker gave Plaintiff an eight week follow up exam. Tr. 350-51. Plaintiff complained of "occasional low back pain" and "some left arm pain and some left shoulder pain with radiating pain into her second and third digits of her upper left extremity." Tr. 350. Plaintiff had a "[n]ormal gait and station." Id. She exhibited normal strength, range of motion, and muscle tone of her head, neck, spine, arms, and legs, excepting limitation in motion due to the collar she wore for her neck injury and her TLSO brace. Id. Overall, Plaintiff's fracture was "stable." Id.

On December 6, 2006, Dr. Morton conducted a psychodiagnostic evaluation for disability services. Tr. 358-61. He diagnosed Plaintiff with Major Depressive Disorder, recurrent and mild, Obsessive Compulsive Disorder[13] (OCD), and PTSD. Though he indicated he conducted a brief review of her psychosocial history, he failed to mention her previous diagnoses of Type I Bipolar Disorder or Panic Disorder with

---

[13] "Obsessive-compulsive disorder is an anxiety disorder in which people have unwanted and repeated thoughts, feelings, ideas, sensations (obsessions), or behaviors that make them feel driven to do something (compulsions)." Obsessive-compulsive disorder, *Pub Med Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001926/, last visited May 23, 2011.

Agoraphobia. Tr. 358-61. Dr. Morton gave her a GAF of 65.[14]
He concluded:

> It appears that there are minimal mental
> limitations in regard to remembering and
> understanding instructions, procedures, and
> locations. There are minimal mental
> limitations in regard to carrying out
> instructions. There are minimal mental
> limitations in regard to maintaining
> attention, concentration, and pace. There
> are mild mental limitations in regard to
> interacting appropriately with supervisors,
> co-workers, and the public. There are
> moderate mental limitations in regard to
> using good judgment and responding
> appropriately to changes in the work place.

Tr. 360-61.

On January 1, 2007, SSA disability examiner, David
Fetters, completed a disability determination form for the
SSA. Tr. 30. Mr. Fetters is not a doctor, and the record
does not indicate he met with Plaintiff. Tr. 30-31. The form
notes Plaintiff suffered from a fracture of the C7 and L1
vertebrae and Major Depressive Disorder which was recurrent
and mild. Tr. 30. In relation to Plaintiff's mental
impairments, Mr. Fetters references a single assessment,
apparently Dr. Morton's, indicating Plaintiff was "capable of

---

[14] A GAF of 61 to 70 indicates "some difficulty in social, occupational, or school functioning." See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Revision 2000).

a wide range of work activity . . . ." Tr. 31. Mr. Fetters concluded Plaintiff was not disabled based on this single mental assessment and a yet non-existent physical RFC assessment scheduled for some time before October of 2007. Tr. 31.

On January 5, 2007, Dr. Weis completed a physical RFC assessment, upon which, somehow, the initial January 1, 2007, denial of disability was partially based. Tr. 30-31. In his assessment, Dr. Weis found Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour work-day, and push and/or pull an amount equal to her ability to lift. Furthermore, Dr. Weis found Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. Tr. 242. The form indicates there were no files from treating or examining sources regarding Plaintiff's physical capacities on record. Tr. 246. There is also no indication Dr. Weis examined the Plaintiff. Dr. Weis concluded:

> Improvement would be anticipated in terms of function and improvement in range of motion and reduction in symptoms of pain to the extent claimant should be capable of RFC as outlined prior to 12 months from her [initial onset date].

Tr. 247.

On January 10, 2007, Dr. Davis completed a mental RFC assessment. Tr. 248. Dr. Davis found Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and, contrary to the earlier findings of Dr. Garfield, no episodes of decompensation. Tr. 262. Dr. Davis noted Plaintiff's credibility was "softened due to her reluctance to seek counseling and her intermittent ongoing use of alcohol." Tr. 250. There is no record indicating Dr. Davis interviewed or examined Plaintiff. Tr. 250.

On February 1, 2007, the Plaintiff filled out another personal pain/fatigue questionnaire. Tr. 143-146. Plaintiff reported sharp headaches, numbness on her entire left side, and sharp pains in her back 24 hours a day. <u>Id.</u> She also stated she could hardly walk some days and could not shave her legs, put on socks, or tie her shoes. <u>Id.</u>

On February 6, 2007, Plaintiff filled out another function report. Tr. 135-142. It indicates she has difficulties standing, can only make simple meals, and needs help vacuuming. Tr. 136-37. In conclusion she wrote: "Due to a bad car accident my whole life has changed for the worse.

I'm [too] depressed and in a lot of pain 24 hours a day. I need help." Tr. 142.

On February 9, 2007, Plaintiff's daughter, Mrs. Hicks, filled out a third party function report. Tr. 127-34. Mrs. Hicks indicated her mother was "homebound much of the time." Tr. 94. Though Mrs. Hicks noted Plaintiff could go shopping, feed and let the dogs out, prepare simple meals, engage in light cleaning, and occasionally babysit her grandchildren, she could not do the laundry, vacuum, "walk long distances, lift objects or exercise" and suffered from "[f]requent insomnia" due to back pain. Tr. 127-30. Mrs. Hicks further indicated that her mother, "[w]hen in [a] manic phase, often overspends with [her] credit card." Tr. 131. She also suffers from "[f]requent mood swings" which make a relationship with her difficult. Tr. 132. Mrs. Hicks also noted Plaintiff's illnesses and injuries affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get along with others. Tr. 132. In conclusion, Mrs. Hicks wrote:

> My mom is disabled due to her bipolar disorder. She has never been able to hold a job and is very unpredictable. Even on [medications], she experiences periods of deep depression that disable her from getting out of bed. To compound this, she

15

> was in a car accident in October[,] 2006[,]
> that has left her with severe pain and
> limitations.

Tr. 134.

On April 12, 2007, Dr. Martin filed a comprehensive examination and report for the State of Iowa Disability Determination Services Bureau. Tr. 400-06. At the examination, Plaintiff was still wearing her TLSO brace and neck collar. Tr. 400. Dr. Martin "felt it was not appropriate to remove [the braces] during the course of the examination" because of her "history of trauma." Tr. 401. She told Dr. Martin that "neurosurgical professionals" had evaluated her and recommended "surgical intervention." Id. She had considerable complaints about back and neck pain and reported she was "not able to do much of anything as a result." Id. Dr. Martin noted that, given the car accident, she was "going to have quite an inhibition on activity level." Tr. 403. With respect to lifting or carrying weight, Dr. Martin limited her to minimal weight occasionally. He thought she would be able to stand only 1 to 2 hours in an 8 hour day. He limited her walking to "no more than a block." Id. She should not stoop, kneel, or crawl. Id. Dr. Martin deemed "frequent or repetitious upper extremity grip, grasp or

manipulative maneuvers" as ill-advised. Id. He also expressed that he "would not suggest exposures in the work environment such as to dust, fumes, temperatures or hazards," based on the Plaintiff's asthma. Tr. 403. Notably, Dr. Martin also indicated his assessment of her strength was limited due to "pain complaints." Tr. 402. He had difficulty discerning "whether or not any of her inhibition with respect to strength testing [was] real or exaggerated." Id.

On May 7, 2007, Dr. Laura Griffith filed a disability determination form denying the Plaintiff benefits. Tr. 28. In a brief explanation of her determination, Dr. Griffith noted the medical evidence indicated Plaintiff was "making steady improvements" with her mental health and back problems. Tr. 28.

On September 7, 2007, Plaintiff went to Dr. Guerdet at the Siouxland Community Health Center for continued back pain. Tr. 409-09. Dr. Guerdet noted that the Plaintiff stated she was unable to go back to the orthopedic surgeon due to a lack of funds but was recently accepted by the Iowa Cares program. Tr. 408.

On November 20, 2007, Plaintiff was given an MRI pursuant to her acceptance into the Iowa Cares program. Dr. Baima

interpreted the MRI, noting a "[s]table L1 vertebral body fracture with anterior fracture fragment and retropulsion." Tr. 433.

In January of 2008, Dr. Hitchon examined Plaintiff at the University of Iowa Hospital pursuant to her acceptance into the Iowa Cares program. Plaintiff reported "significant amount of low back pain and weakness throughout the left side with weakness and numbness throughout the upper and lower extremities." Tr. 431. Dr. Hitchon noted an increase to 24 degrees of angulation due to her L1 fracture. Id. Plaintiff displayed "a mild amount of weakness throughout the upper left and lower left extremities," but her "effort [was] questioned." Id. Dr. Hitchon recommended a "conservative" course of treatment "if at all possible." Tr. 432.

On October 7, 2008, the ALJ held a hearing in which Plaintiff testified. Tr. 458-92. She testified she had problems dressing, tying her shoes, and walking more than a block. Tr. 470-71. On bad days, she stayed in her pajamas and didn't leave the house. Tr. 475.

## III. ALJ's Decision

Under the authority of the Act, the Social Security Administration (SSA) has established a five-step sequential

evaluation process for determining whether an individual is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520 and 416.920. The five successive steps are: (1) determination of whether claimant is engaged in "substantial gainful activity," (2) determination of whether claimant has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether claimant's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether claimant's Residual Functional Capacity (RFC) indicates an incapacity to perform the requirements of his/her past relevant work, and (5) determination of whether, given claimant's RFC, "age education and work experience," claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(4)(i-v) and 416.920(a)(4)(i-v).

At step one, if the Plaintiff is engaged in "substantial gainful activity" within the period the Plaintiff claims to be disabled, there is no disability during that period. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). The ALJ determined the Plaintiff had "not engaged in substantial gainful activity" since her claimed initial onset date. Tr. 19.

At step 2, if the Plaintiff does not have a "severe medically determinable physical or mental impairment" that lasts at least 12 months, there is no disability. 20 C.F.R. §404.1520(a)(4)(ii) and 416.920(a)(4)(ii). The ALJ determined the Plaintiff had the following severe impairments:

> chronic low back pain, status post a motor vehicle accident on October 7, 2006, currently treated with Tramadol and Gabapentin, and a major depressive disorder, recurrent, currently treated with Depakote.

Tr. 19.

At step 3, if the Plaintiff's impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and last at least 12 months, the Plaintiff is deemed disabled. 20 C.F.R. §§ 404.1520(e) and 416.920(a)(4)(iii). The ALJ determined Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . ." Tr. 19.

Before proceeding to step 4 and 5, the ALJ must determine the Plaintiff's RFC. RFC is the "most" a person "can still do" despite their limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ found Plaintiff had the following RFC:

claimant has the . . . capacity to perform
light work as defined in 20 C.F.R. §
404.1567(b) and 416.967(b) except should
not perform postural activities on more
than an occasional basis and is limited to
the performance of simple and routine
unskilled work activity.

Tr. 20.

At step 4, if, given Plaintiff's RFC, Plaintiff can still
perform their past relevant work, there is no disability. 20
C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). The ALJ
found the "exertional and/or mental requirements of jobs"
within the Plaintiff's past relevant work history exceeded her
RFC. Tr. 25. In reaching his determination, the ALJ
specifically noted Plaintiff could perform her previous job as
a housekeeper, but, given the duration of the employment and
earnings therefrom, it did not constitute "substantial gainful
activity" and, therefore, was not taken into consideration at
step 4. Tr. 25 and 26.

At step 5, if, given Plaintiff's RFC, age, education, and
work experience, the Plaintiff can make an adjustment to other
work, there is no disability. 20 C.F.R. §§ 404.1520(a)(4)(v)
and 416.920(a)(4)(v). This step requires the ALJ to provide
"evidence" that the Plaintiff could perform "other work [that]
exists in significant numbers in the national economy." 20

C.F.R. § 404.1560(c)(2). In other words, at step 5, the burden of proof shifts from the Plaintiff to the Commissioner of the SSA. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). At the administrative level, an ALJ generally calls a Vocational Expert (VE) to aid in determining whether this burden can be met.

In this case, the ALJ concluded that, in accordance with the testimony of the VE at the hearing and given Plaintiff's age, education, work experience, and RFC, there were other jobs "in significant numbers in the national economy" Plaintiff could perform; specifically, the ALJ found Plaintiff could perform her past job as a house cleaner. Tr. 25.

## IV. Law and Analysis

### 1. Standard of Review

This Court's role in review of the ALJ's decision requires a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Owen v. Astrue, 547 F. 3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance but enough that a reasonable mind might find it adequate to support the conclusion in question. Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008) (citing Kirby v.

*Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)).  This Court must consider both evidence that supports and detracts from the ALJ's decision.  *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006) (citing *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)).  In applying this standard, this Court will not reverse the ALJ, even if it would have reached a contrary decision, as long as substantial evidence supports the ALJ's decision.  *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004).  The ALJ's decision shall be reversed only if it is outside the reasonable "zone of choice."  *Hacker v. Barnhart*, 459 F. 3d 934, 936 (8th Cir. 2006) (citing *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994)).

This Court may also ascertain whether the ALJ's decision is based in legal error.  *Laurer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001).  If the ALJ applies an improper legal standard, it is within this Court's discretion to reverse his decision.  *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); 42 U.S.C. 405(g).

## 2.  The ALJ's RFC Assessment

An ALJ's RFC assessment has been referred to as the "most important issue in a disability case . . . ."  *Malloy v. Astrue*, 604 F. Supp. 2d 1247, 1250 (S.D. Iowa 2009) (citing

McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982)(en banc)). When determining RFC, the ALJ must consider all of the relevant evidence and all of the Plaintiff's impairments, even those which are not deemed severe, as well as limitations which result from symptoms, such as pain. 20 C.F.R. § 404.1545(a)(2) and (3).

This case presents a unique scenario because the ALJ did not properly state the Plaintiff's RFC in his decision. He instead provided a conclusion as to the type of work the Plaintiff could perform, i.e. "light work as defined in 20 C.F.R. § 404.1567(b)."[15] Tr. 20.

An RFC determination must list a Plaintiff's "work-related abilities on a function-by-function basis." S.S.R. 96-8P, 1. Only then may a Plaintiff's "RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. To allow otherwise would be to allow an ALJ to put the cart before the horse. An "[i]nitial failure to consider an individual's ability to

_____

[15] § 404.1567(b) defines light work as, "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

perform the specific work-related functions could be critical to the outcome of a case" <u>Id.</u>

The Commissioner's brief contends the AlJ's hypothetical question posed to the VE at the hearing indicated the ALJ properly assessed Plaintiff's "abilities on a fuction-by-function basis." Docket No. 17 at 20. The ALJ did in fact pose a hypothetical involving a person who could:

> occasionally lift or carry 20 pounds, frequently 10 pounds, can stand or walk or sit about six of eight hours, push pull's unlimited, postural activities could be performed occasionally, no manipulative or visual or communicative or environmental limitations.

Tr. 489.

Though the ALJ's hypothetical did not detail the Plaintiff's mental limitations, it did reference Dr. Davis' mental RFC assessment. Tr. 490. Dr. Davis had concluded the Plainitff was not significantly limited in 18 of the 20 categories related to residual mental functional capacity and was only moderately limited in two: (1) the ability to respond appropriately to changes in work setting and (2) the ability to maintain attention and concentration for extended periods of time. Tr. 248-49.

While the hypothetical the ALJ posed to the VE may indicate he <u>adopted</u> a function-by-function RFC, it does not appear he <u>developed</u> one. This distinction is critical. The regulations require an ALJ to consider "<u>all</u> the relevant medical and other evidence" on file. (emphasis added) 20 C.F.R. §404.1520(e). An ALJ's failure to include a function-by-function assessment in his decision constitutes clear error. At the very least, a conclusory RFC finding raises questions as to whether "limitations or restrictions that would narrow the ranges and types of work an individual may be able to do" were overlooked. S.S.R. 96-8P, 3-4.

### 3. Medical Opinion Evidence

The regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of . . . impairment(s)." 20 C.F.R. § 404.1527(a)(2). If the medical evidence on record is inconsistent, an ALJ has a duty to weigh the evidence. § 404.1527(c)(2). In aid of this task, the regulations create a general hierarchy of medical evidence, distinguishing the relative weight various sources of medical evidence should be given. § 404.1527(d). At the top of the hierarchy are opinions from treating physicians,

next are non-treating, examining source opinions, and, finally, there are opinions from non-examining sources, such as state and federal consultants, whose opinions are limited to a review of a plaintiff's medical history. Id.

Of course, this hierarchy is not absolute. The opinions of treating physicians are not automatically given more weight than the opinions of examining and non-examining physicians. The regulations go on to discuss a number of factors to be considered when assessing the weight of medical opinions. § 404.1527(d)(2)-(6). For instance, treating opinions should be viewed in light of the "[l]ength of the treating relationship and frequency of examination," as well as the "[n]ature and extent of the [treating] relationship," including the type of treatment provided and "the extent of examinations and testing . . . provided." § 404.1527(d)(2). In addition, treating, examining, and non-examining source opinions should all be evaluated in terms of the relevant evidence used to support the opinion, the internal consistency of the opinion, the specialization of the source of the opinion, and other factors a plaintiff or others bring to the attention of the Commissioner. § 404.1527 (d)(3)-(6).

## 4. Plaintiff's Physical Functional Capacity

When determining a plaintiff's RFC assessment, the regulations require a bifurcated approach with two separate processes, one for determining a plaintiff's relevant physical limitations and another for determining a plaintiff's relevant mental limitations. See 20 C.F.R. 404.1545(b) and (c). While the ALJ is the fact-finder who is ultimately responsible for an RFC determination, a court may consider evidence that weighs against the ALJ's determination. Wright v. Barnhart, 105 Fed. Appx. 883, 885 (8th Cir. 2004). The general standard of review allows a district court to determine whether the ALJ's determination related to the medical evidence falls outside the reasonable "zone of choice." See Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007) (citing Hacker v. Barnhart, 459 F.3d 881, 885 (8th Cir. 2007).

The RFC the ALJ ascribed to Plaintiff was taken directly from Dr. Weis' physical assessment. Tr. 241-42 and Tr. 489. As previously noted, Dr. Weis determined the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, sit and stand and/or walk about 6 hours in an 8-hour work day, push and/or pull an unlimited amount, and perform unlimited postural activities occasionally. See Tr. 241-42. The record

does not indicate Dr. Weis ever examined the Plaintiff. Tr. 241-47. Dr. Weis also checked a box on the assessment form indicating that his decision was made without the benefit of treating or examining source information regarding the Plaintiff's physical capacities. Tr. 246.

It is perplexing to understand how Dr. Weis arrived at his opinion without examining Plaintiff or having any information from examining or treating physicians relating to Plaintiff's functional limitations. Tr. 247. In addition, Dr. Weis' evaluation was couched in terms of Plaintiff's prognosis and made at a time when the Plaintiff was, according to Dr. Weis' own notes, still in a "body cast." Tr. 247. As previously mentioned, Dr. Weis noted, "[i]mprovement would be anticipated in terms of function and . . . range of motion and reduction in symptoms of pain . . . ." Id. He concluded that, prior to a year after her injuries were sustained, Plaintiff "should be capable of [the] RFC as outlined." Tr. 247.

Four months after Dr. Weis assessed the Plaintiff's RFC, Dr. Martin examined Plaintiff and submitted a comprehensive examination report to the Disability Determination Services Bureau. Tr. 400-06. As previously noted, Dr. Martin

concluded Plaintiff, given the nature of her car accident, was "going to have quite an inhibition on activity level." Tr. 403. With respect to lifting or carrying weight, Dr. Martin limited her to minimal weight occasionally. Id. He thought she would be able to stand only 1 to 2 hours in an 8 hour day. Id. He limited her walking to "no more than a block," and stated she should not stoop, kneel, or crawl. Id. He expressed a need to limit her work environment to avoid dust and fumes due to her asthma. Id. He also deemed "frequent or repetitious upper extremity grip, grasp or manipulative maneuvers" as ill-advised. Id.

In arriving at his determination of Plaintiff's RFC, the ALJ gave "very little weight to the functional limitations expressed by Dr. Martin." Tr. 23. The ALJ gave the following reasons for his determination: (1) Plaintiff misrepresented that corrective surgery had been recommended; (2) Plaintiff misrepresented her need for the TLSO brace; (3) Dr. Martin "assigned functional limitations . . . based on" Plaintiff's subjective "allegations" alone; and (4) Dr. Martin expressed concerns about the credibility of Plaintiff's limitations. Tr. 23.

It is true that the record is void of any mention of a recommendation that Plaintiff undergo surgery, however, prior to her visiting Dr. Martin, there is also no indication that surgery was ruled out. It is also true that in 2008, Dr. Hitchon, a neurosurgeon at the University Iowa Hospital, recommended a "conservative" course of treatment "if at all possible," but this does not provide a reasonable basis for the ALJ's accusation that Plaintiff misrepresented a recommendation for surgery. Tr. 432. Notably, the recommendations from the neurosurgeons at the University of Iowa took place after Dr. Martin's examination. Id. Given the nature of Plaintiff's accident, it is not unlikely that one of the many physicians who treated her prior to Dr. Martin's examination discussed a potential need for surgery.

The ALJ also noted Dr. Martin's conclusions were unreliable because Plaintiff was still wearing her TLSO brace and neck collar. The Commissioner's brief points out that an Advanced Registered Nurse Practitioner, Ms. Schumaker, had instructed Plaintiff "to wear her back brace for only four more weeks" four months prior to Dr. Martin's evaluation, but this is inaccurate. Docket No. 17, 18. Ms. Schumaker noted Plaintiff should continue to wear her "TLSO brace application

for _approximately_ [four] more weeks." (emphasis added) Tr. 351. She also specifically instructed Plaintiff to continue wearing her "rigid collar" application until an MRI was obtained. Tr. 351. The Plaintiff did not obtain an MRI until after Dr. Martin's evaluation due to financial difficulties. Tr. 23 and 433. While the record may not absolutely bare out Plaintiff's representations to Dr. Martin, this Court is persuaded that the ALJ's decision to label these representations as somehow false or misleading is not supported by substantial evidence on the record as a whole.

The ALJ's final two justifications for giving little weight to Dr. Martin's physical functional assessment should be viewed in light of the ALJ's final decision to adopt the RFC as assessed by Dr. Weis. Dr. Martin did indicate that at least some of his assessment was based on Plaintiff's subjective allegations. Tr. 400-02. It is also true that Dr. Martin expressed concerns as to "whether or not any of [Plaintiff's] inhibition with respect to strength testing [was] real or exaggerated," but he ultimately settled on the conclusion that the Plaintiff had real physical limitations. Tr. 402-03. Dr. Martin's doubts related to and partial reliance on Plaintiff's subjective allegations may have been

significant in weighing the medical evidence if there had been any other evidence from an examining source on record related to Plaintiff's functional limitations, but there was none. The ALJ simply gave "very little weight" to Dr. Martin and wholesale adopted the functional limitations opined by a non-examining consultant who considered no medical evidence related to Plaintiff's functional capacities and developed his RFC assessment based on what Plaintiff might be able to do within the next twelve months.  Tr. 20-23.

In addition to his criticism of Dr. Martin's findings, the ALJ, as well as the Commissioner, direct this Court to statements made by the Plaintiff and treating physicians for general support of the ALJ's physical RFC findings.  For example, in terms of inconsistencies, the Plaintiff reported that "moving and dancing" would reduce her pain."  Tr. 24. The Plaintiff also referred to her injury sustained in the accident as a broken back when it was, according to the ALJ, merely a fracture.  Tr. 22.

First, this Court is not concerned that "moving" helped the Plaintiff's back pain; it is common knowledge that individuals with back problems often have to shift positions to avoid pain.  Second, while some people dance vigorously,

others engage in more of a gentle sway, especially those wearing a TLSO brace and a neck collar. This Court refuses to view Plaintiff's singular notation related to dancing, amongst numerous notations related to her debilitating pain, with a cynical eye. Finally, the medical definition of a fracture is a "break, especially the breaking of a bone or cartilage." Thus, though Plaintiff's characterization of her injury may have been dramatic, it is technically more accurate than the ALJ's medical assessment. Stedman's Medical Dictionary 686 (26th ed. 2006).

The ALJ and the Commissioner also point to brief statements in the treatment record. For instance, at one point, the Plaintiff complained of "only occasional back pain," and Dr. Rizk described the Plaintiff as "overall doing well . . . less than one moth after her accident." Tr. 22; Docket No. 17, 17. These brief statements and others must be taken in context. The statement that Plaintiff was "overall doing well" was made eight weeks after she had been thrown from a car, fractured her back in two places, and punctured a lung. Tr. 325. It does not bear on whether Plaintiff was then capable of full time work. The statement that she had "only occasional back pain" was made when she was still

wearing her TLSO brace, and was, according to a third party function report from her daughter, "homebound" much of the time. Tr. 350 and 94. Given the circumstances surrounding and nature of the statements, they have little bearing on Plaintiff's functional limitations, which are at issue.

This Court is persuaded that, in adopting Dr. Weis' RFC finding, the ALJ overlooked some of Plaintiff's functional limitations. First, as previously mentioned, Dr. Martin noted that "frequent or repetitious upper extremity grip, grasp or manipulative maneuvers" was ill-advised, while Dr. Weis checked a box indicating Plaintiff had no established manipulative limitations. Tr. 403 and 243. Dr. Martin also noted Plaintiff should not stoop, kneel, or crawl, while Dr. Weis checked a box indicating she had no such limitations though she was in a "body cast" at the time he issued his report. Id. Dr. Martin also expressed that he "would not suggest exposures in the work environment such as to dust, fumes, temperatures or hazards," based on Plaintiff's asthma, while Dr. Weis checked a box indicating Plaintiff had no environmental limitations. Tr. 403 and 244. Though it may be argued that the ALJ's justifications for giving little weight to Dr. Martin's RFC assessment explains why the ALJ failed to

include manipulative and postural limitations in his RFC finding, his justifications were outside the reasonable zone of choice and do not seem to apply to the environmental limitations Dr. Martin identified. Dr. Martin's suggested environmental limitations were not derived from conversations with Plaintiff, Plaintiff's statement related to a recommendation for back surgery, or Plaintiff's use of a TLSO brace; they were derived from the notes of treating physicians indicating Plaintiff had asthma issues and was using an Albuterol inhaler. Tr. 401. In other words, the environmental limitations came from a thorough review of the record. This oversight is particularly important, since, at step-five of the sequential evaluation process, the ALJ determined the Plaintiff could work as a housekeeper/cleaner – a job which would no doubt expose the Plaintiff to dust and fumes – without identifying any other jobs available in the national economy. Tr. 26.

The Commissioner's brief cites the Eighth Circuit's recent decision in <u>Gates v. Astrue</u> for the proposition that "evidence from a non-examining medical source, combined with treatment records, can constitute substantial evidence in support of an ALJ's decision." Docket No. 17, 19 (citing 627

F.3d 1080, 1082-83 (8th Cir. 2010)). This Court is in agreement. The regulations state medical consultants are "highly qualified" physicians. 20 C.F.R. § 404.1527(f)(2)(i). However, Gates is distinguishable from the case at bar in that the non-examining consultant appeared to be the only medical opinion on record regarding the plaintiff's functional limitations. In this case, the ALJ relied on, without discussing its merits, a patently flawed function report from a non-examining consultant and dismissed a function report from an examining physician.

Though this Court takes note of the Eighth Circuit's decision in Gates, the Gates' Court did not abrogate the long standing rule that "the opinion of a consulting physician alone does not generally constitute substantial evidence . . . ." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). This Court would add that this is especially true when there is a report from a competing consultant who actually examined the Plaintiff, provided more explanation and analysis for their decision, employed strength testing, and based their decision on the Plaintiff's current state rather than conjecture. Overall, this Court is persuaded the ALJ's

determination of the Plaintiff's physical RFC was not supported by substantial evidence and was outside the reasonable zone of choice given the record as a whole.

**5. Plaintiff's Mental Functional Capacity**

As previously noted, throughout her history with Disability Services, the Plaintiff was diagnosed with numerous mental disorders: Bipolar Type 1 Disorder, Panic Disorder with Agoraphobia, Post Traumatic Stress Disorder (PTSD), Major Depressive Disorder, recurrent and mild, and Obsessive Compulsive Disorder (OCD). Tr. 223. At step 2 of the sequential evaluation process, the ALJ determined Plaintiff's only severe mental impairment was "major depressive disorder, recurrent . . . ." Tr. 19. The ALJ failed to discuss why Plaintiff's other ailments did not qualify as severe.

As previously discussed, the ALJ, in terms of mental impairments, determined the Plaintiff was only capable of performing "simple and routine work activity," which is a conclusion rather than a function-by-function assessment. Tr. 19. However, in his hypothetical posed to the Vocational Expert (VE), the ALJ did reference Dr. Davis' medical opinion related to Plaintiff's mental RFC. Tr. 409. Dr. Davis had noted Plaintiff had moderate limitations in her ability to

respond appropriately to changes in work setting and the ability to maintain attention and concentration for an extended period of time. Tr. 248-49 and 490.

Dr. Davis, like Dr. Weis, did not examine the Plaintiff, and, though Dr. Davis mentioned the Plaintiff's PTSD and OCD, she failed to mention the Plaintiff's Panic Disorder with Agoraphobia and concluded that her "medically determinable impairment[s]" were "Depression/Bipolar." As previously noted, the regulations establish a clear preference, in most instances, for the opinions of examining physicians over non-examining physicians. 20 C.F.R. § 404.1527(d)(1).

As previously mentioned, prior to Dr. Davis' review of Plaintiff's medical assessment, the Plaintiff was examined by Dr. Marandola on May 31, 2006. The ALJ noted Dr. Marandola's report without criticizing the results and indicated it was consistent with his finding of RFC. Tr. 21. This is simply not accurate. As previously noted, an RFC, properly crafted, is a function-by-function assessment. The assessment of mental "functional limitation is a complex and highly individualized process that requires" consideration of "multiple issues and all relevant evidence to obtain a longitudinal picture" of a plaintiff's "overall degree of

functional limitation." 20 C.F.R. § 404.1520a. In addition to finding the same deficits Dr. Davis later found, Dr. Marandola concluded that Plaintiff had life long difficulties "interacting with people," including "supervisors, co-workers and the public," which is consistent with the medical definition of Panic Disorder with Agoraphobia. Tr. 294-93. Dr. Marandola also found Plaintiff had a long history of difficulty using "good judgment and adjusting well to change," which may compromise a plaintiff's relevant ability to make simple work-related decisions and/or the ability to set realistic goals or make plans independently of others. Tr. 292-3. Further, while Dr. Davis and the ALJ, via adoption of Dr. Davis' report, determined Plaintiff had no significant limitations in the vast majority of mental functional categories, Dr. Marandola gave Plaintiff a Global Assessment of Functioning (GAF) score of 53, indicating Plaintiff was on the low end of individuals with moderate difficulties throughout the spectrum of social/occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 and 34 (4th ed., Text Revision 2000).

As previously mentioned, in addition to Dr. Marandola, Dr. Morton examined Plaintiff on December 6, 2006. Tr. 358-61. He diagnosed her with Major Depressive Disorder, recurrent and mild, OCD, and PTSD. Dr. Morton assessed Plaintiff with minimal limitations across the spectrum of mental functional categories with the exception of mild limitations with regard to social interactions and moderate limitations with regard to good judgment. Though he indicated he conducted a brief review of her psychosocial history, he failed to mention her previous diagnoses of Type I Bipolar Disorder or Panic Disorder with Agoraphobia. Tr. 358-61. While Dr. Morton examined Plaintiff, and, as such, his opinion should be given careful consideration, he failed to consider some of Plaintiff's diagnosed mental conditions without identifying why and so no doubt failed to note corresponding functional limitations.

The ALJ has a duty to weigh inconsistent evidence using the relevant factors outlined in the regulations. 20 C.F.R. 404.1527(c)(2) and (f)(2)(ii). The ALJ also has a duty to "explain in the decision the weight given to the opinions of a State agency medical consultant." 20 C.F.R. § 404.1527(f)(2)(ii). Prior to adopting a consultative report,

an ALJ must consider whether "all the diseases, impairments and complaints described in the history are adequately assessed and reported in the clinical findings" and "[w]hether the conclusions correlate" with a plaintiff's "medical history, clinical examination[s] and laboratory tests . . . ." 20 C.F.R. § 404.1519p. In this case, the ALJ did none of these things and instead simply adopted the findings of Dr. Davis. Tr. 21. Given the regulatory guidelines for weighing medical evidence, this Court is persuaded that Dr. Marandola's assessment has more indica of reliability than that of Dr. Davis or Dr. Morton. First, Dr. Marandola examined the Plaintiff. Second, Dr. Marandola performed and based her conclusions in a GAF. Third, Dr. Marandola's report is more thorough, discusses all of Plaintiff's mental impairments, and directly ties those mental impairments with functional limitations.

Mrs. Hicks', Plaintiff's daughter, third party function reports also corroborate Dr. Marandola's findings. As previously outlined in the facts section, Mrs. Hicks was predominantly concerned with her mother's mental health. In the function report of May 11, 2006, Mrs. Hicks indicated Plaintiff had problems managing her money and focusing on

tasks because of her mental illness. Tr. 191-95. She described Plaintiff as generally anti-social, moody, argumentative, and paranoid. Tr. 195-97. In her report dated February 9, 2007, Mrs. Hicks indicated her mother overspends when gripped in mania and suffers from "frequent mood swings," making a relationship with her difficult. Tr. 132. She concluded, "[m]y mom is disabled due to her bipolar disorder. She has never been able to hold a job and is very unpredictable." Tr. 134.

In his decision, the ALJ never specifically refers to Mrs. Hicks' third party function reports. Tr. 24. He does reference the function reports of "early February 2007," and criticizes them because they were filled out close in time to Plaintiff's automobile accident and as such "are given little weight . . . as to [Plaintiff's] subsequent experience of pain and ability to function." Tr. 24. Still, this brief criticism seems unrelated to Mrs. Hicks' observations of her mother's mental condition; it only appears to erode the importance of her observations of her mother's physical pain resulting from the car accident. Furthermore, the ALJ simply fails to comment on Mrs. Hicks' third party function report prior to Plaintiff's accident. The Eighth Circuit has

"frequently criticized" the failure of an ALJ "to consider subjective testimony of family and others." <u>Smith v. Heckler</u>, 735 F.2d 312, 317 (8th Cir. 1984). "If the ALJ is to reject such testimony, it must be specifically discussed and credibility determinations expressed." <u>Id.</u>

Mental illness waxes and wanes over time, and Mrs. Hicks was the only person on record in a position to have a longitudinal understanding of her mother's mental condition. Furthermore, there is an obvious social stigma attached to admitting that a family member suffers from mental illness. For these reasons, this Court finds Mrs. Hicks' lay opinions particularly persuasive.

In general support of his mental RFC finding, the ALJ noted that Plaintiff had "limited use of anti-depressant medication and little follow-up with her primary care provider for treatment for depression . . . ." Tr. 22. However, as noted in the fact section above, the record indicates Plaintiff has an extensive history of taking medications, and though Plaintiff did, at one time, decrease her Depakote prescription on her own, this Court was unable to find substantial evidence on record that Plaintiff was not taking the proper medications throughout most of the period for which

she seeks disability. <u>See</u> Tr. 115, 155, and 469. Further, when dealing with mental disorders, the ALJ's "decision 'must take into account evidence indicating that the [Plaintiff's] true functional ability may be substantially less than the [Plaintiff] asserts or wishes.'" <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001) (citing <u>Parsons v. Heckler</u>, 739 F.2d 1334, 1341 (8th Cir. 1984).

Though Plaintiff may have, on occasion, failed to seek medical treatment for her mental illnesses, the record also indicates she generally had a valid excuse. At one instance, Plaintiff declined a follow up psychiatric review due to a lack of transportation. Tr. 22. At the time, Plaintiff lived some 60 miles from the Siouxland Community Health Center in Sioux City, Iowa, where she was being treated; and, despite the fact that she does not drive, she, overall, did make frequent trips to Sioux City for treatment. Tr. 407-430.

The record also indicates Plaintiff did not have any private health insurance as of May 4, 2006. Tr. 110. An "inability to afford medication" or medical treatment "cannot be used as a basis for a denial of benefits." <u>Tang v. Apfel</u>, 205 F.3d 1084, 1086 (8th Cir. 2000). Finally, even accepting the ALJ's accusations of failure to seek treatment on their

face, the Eighth Circuit

> has recognized that a mentally ill
> claimant's noncompliance with treatment can
> be, and ordinarily is, the result of her
> mental impairment, and thus is not willful
> or without a justifiable excuse.

Conklin v. Astrue, 360 Fed. Appx. 704, 706 (8th Cir. 2010)
(citing Pate-Fires v. Astrue, 564 F.3d 935, 945-47 (8th Cir.
2009)).

For the above reasons, this Court is persuaded that the
ALJ's RFC finding in relation to Plaintiff's mental
impairments is not supported by substantial evidence on the
record as a whole.

## V. Conclusion

It is clear the ALJ erred in several respects. The
question then becomes whether this Court should remand for
further consideration or solely for the purpose of awarding
benefits. The Eighth Circuit has held that a remand for award
of benefits is appropriate where "the record 'overwhelmingly
supports'" a finding of disability. Buckner v. Apfel, 213
F.3d 1006, 1011 (8th Cir. 2000) (citing Thompson v. Sullivan,
957 F.2d 611, 614 (8th Cir. 1992)).

After careful review of the record, this Court is
convinced that the overwhelming majority of the evidence on
the record as a whole supports the conclusion that the

Plaintiff's combination of mental and physical impairments rendered her disabled as of the date of the Plaintiff's car accident on October 7, 2006.

**Therefore, the Commissioner's decision is reversed and remanded solely for the calculation of benefits.**

**IT IS SO ORDERED** this 15th day of September, 2011.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa